John Factor (sometimes known as Jacob Factor) v. Commissioner.
Factor v. Commissioner
Docket No. 12440.
United States Tax Court
T.C. Memo 1958-94; 1958 Tax Ct. Memo LEXIS 137; 17 T.C.M. (CCH) 459; T.C.M. (RIA) 58094; May 23, 1958
*137 Petitioner's income was determined by respondent, in the absence of records, by including therein certain disbursements of two solely owned Canadian organizations, certain remittances from individuals, and certain bank deposits. Held, petitioner failed to prove that such disbursements, remittances, and deposits were not received by or for his benefit and should not be included in his gross income. Held, further, various costs and expenses of petitioner's business, in addition to those allowed by respondent, were not properly pleaded and are not before the Court. Held, further, petitioner failed to prove that he sustained a bad debt loss relating to the worthlessness of the Kourakos debt. Held, further, petitioner's sale of realty securing the Kourakos note, four-fifths of the Ginsburg note, and the sale of securities through a broker resulted in capital losses and are subject to capital loss limitations. Held, further, part of the deficiencies in 1935, 1936 and 1937 was due to fraud with intent to evade tax and petitioner is liable for the 50 per cent addition to tax under section 293(b) of the Revenue Acts of 1934 and 1936. Held, further, petitioner did not prove that his failure *138 to file a return in 1937 was due to reasonable cause, therefore, he is liable for the addition to tax under section 291, Revenue Act of 1936. Jack B. Rubin, Esq., 29 South La Salle Street, Chicago, Ill., and Robert E. Sher, Esq., for the petitioner. George T. Donoghue, Jr., Esq., and Arthur N. Nasser, Esq., for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: The respondent determined the following deficiencies in income tax of petitioner and additions to the tax under section 293(b) of the Revenue Acts of 1934 and 1936 and the Internal Revenue Code of 1939, and section 291 of the Revenue Act of 1936, as follows: Additions to Tax
Year
Deficiency
Sec. 293(b)
Sec. 291
1935
$ 38,315.03
$19,157.52
1936
134,912.23
67,456.12
1937
85,905.19
42,952.60
$21,476.30
1939
45,945.52
22,972.76 Concessions made by both parties, including that of respondent conceding that the year 1939 is barred by the statute of limitations, are *140 to be taken into account by a Rule 50 computation. The issues are as follows: 1. Whether petitioner received gross income with respect to certain disbursements of two Canadian corporations, wholly owned by petitioner. 2. Were deposits of $44,383.19 in 1935 in petitioner's account under the name of Miss C. Pitts, petitioner's bookkeeper, in the Lake Shore Trust and Savings Bank, Chicago, Illinois, includible in petitioner's gross income for 1935? 3. Were deposits of $9,937.49 during 1937 in a commercial account in the name of Louis D. Pitts in the Bank of Toronto, Montreal, Canada, includible in petitioner's gross income for 1937? 4. Is petitioner entitled to deductions for business expenses and advances made in addition to those allowed by the respondent in the years before us? 5. Is petitioner entitled to a bad debt deduction for 1935 of $25,000 for claimed worthlessness of a mortgage debt? 6. Is petitioner entitled to a deduction for an ordinary loss for 1936 of $30,000 on the sale in that year of the property at 4146-56 Broadway, Chicago, Illinois? 7. Is petitioner entitled to a deduction for an ordinary loss for 1937 of $25,000 on the sale of a four-fifths interest *141 in the Ginsburg mortgage note? 8. Is petitioner entitled to a deduction for an ordinary loss for 1936 of $12,304.87 from the sale of securities through a broker? 9. Is some part of the deficiency for each of the years 1935, 1936 and 1937 due to fraud with intent to evade tax? 10. Has the statute of limitations run on any of the years before us? 11. Is an addition to the tax under section 291, Revenue Act of 1936, due from petitioner for 1937 for failure to file a return for that year? Findings of Fact Some of the facts were stipulated and are found accordingly. Many of the facts were agreed upon at the trial and in the briefs. Those facts which are stipulated or agreed upon will, for the purposes of convenience, clarity, and briefness, be set out in narrative form. John Factor, sometimes referred to as the petitioner, is now and was during the taxable years, a resident alien. He resided in Los Angeles, California, from January 1, 1935 to approximately June 1937, when he moved to Chicago, Illinois. He filed his income tax returns for the years 1935 and 1936 with the then collector of internal revenue for the sixth district of California. He failed to file an income tax *142 return for the year 1937. Petitioner now resides in Beverly Hills, California. Sometime in early 1935, petitioner decided to enter the business of dealing in stock securities in England. He was instrumental in setting up organizations in England and in Canada to facilitate his plans. His Canadian organizations were formed to acquire gold mining stocks and his English organizations were formed to sell such stock to the general public in England. Petitioner was not in England or Canada during the taxable years. The first Canadian organization formed was Montray Finance Corporation, Ltd., sometimes referred to as Montray. It was formed on July 4, 1935 and had its oneroom office in Montreal, Canada, from July 1935 to October 1936. Its nominal organizers and officers were salaried employees of petitioner and had no prior experience in dealing with securities. None of them owned any of Montray's capital stock nor had any investment in it. The principal duty performed by the president of Montray was the signing of checks issued by the corporation. Montray was wholly-owned and controlled by petitioner. At all times material petitioner attempted to conceal this ownership. The successor *143 corporation to Montray in Canada was Gold Underwriters (Canada), Ltd., sometimes referred to as Gold Underwriters. This corporation was organized in 1933 but had been inactive. In October of 1936 three shares of its stock were issued, one share each, to employees or nominees of petitioner, none of whom paid anything for the shares. These employees or nominees were elected directors and officers of the corporation. The corporation's office was in the apartment of Louis Pitts, one of petitioner's employees. The only duty of the president of the corporation was signing checks of the corporation in blank and turning them over to Pitts, who filled in amounts, payees, and countersigned them. Gold Underwriters was wholly-owned and controlled by petitioner. At all times material he attempted to conceal his ownership of the corporation. The principal selling organization formed by petitioner in England was C. Rankin Nevens & Co., sometimes referred to as Nevens. This organization was formed as an ostensible partnership between a Canadian citizen, C. Rankin Nevens, and Harry J. Goulding, a British subject who was a brother-in-law of petitioner. The parties were not in fact partners but were *144 employees of the petitioner. Neither contributed any money to Nevens and neither had any previous experience in dealing in securities. Each received a salary of $100 per week from Nevens in terms of United States money during his employment. C. Rankin Nevens' employment terminated in September 1935 and Goulding's employment terminated in the latter part of 1936 or the first part of 1937. Petitioner contributed the capital with which Nevens began business. He hired its salesmen, dominated and controlled its activities; he was the owner of its assets and income. At all times material he attempted to conceal his interest in Nevens. In May and June of 1935 petitioner began negotiations, through his attorney, A. C. Berman, to acquire for Montray certain shares of the capital stock of Kirkland Gold Rand, Ltd., a Canadian corporation, hereinafter referred to as KGR. This corporation owned a gold mine and had its principal office in Montreal, Canada. Its authorized capital stock was 3,000,000 shares of $1 par value in Canadian money. The stock had never been listed on any stock exchange. Agreement was reached as to terms under which the stock could be acquired and petitioner approved the *145 agreement. Pursuant to this and later agreements, Montray and Gold Underwriters acquired within the years before us something over a million shares of KGR at prices ranging from $.05 a share to $.45 a share, or at a total cost of $277,535. On July 6, 1935, Montray granted Nevens an option to purchase its share of KGR for $.90 a share in Canadian money. After Gold Underwriters succeeded Montray, the same option was extended to Nevens. Nevens sold the shares at a price of 5 shillings a share, equivalent in United States money to approximately $1.25. As Nevens sold the stock in England, it paid its own expenses, including those for rent, salaries of employees and commissions of salesmen, from its gross receipts. The record does not show the gross income or expenses of Nevens for any period in which it operated. As Nevens sold shares of KGR, remittances were made by Nevens to Montray and Gold Underwriters, which funds were deposited in their respective accounts. Montray and Gold Underwriters in turn paid for the stock purchased and certain other expenses and made remittances of surplus funds to the petitioner or to others for his benefit. Petitioner arranged withdrawals by telephone *146 calls to Montray and Gold Underwriters. The respondent determined that the disbursements of Montray and Gold Underwriters, which were not for expenses such as the cost of stock, salaries, etc., constituted gross income to the petitioner. Many of the disbursements were traced directly to petitioner; others were stipulated to have been expense items; the remainder are in controversy as to the recipient. In his income tax returns for 1935 and 1936 petitioner failed to report any income from Montray. He failed to file a return for 1937. A cash journal in which Montray's receipts and disbursements were entered was kept in the regular course of business during the period in which it operated. No general ledger was kept by Montray. Gold Underwriters' only records were its deposit slips, bank statements, canceled checks and check stubs. Petitioner failed to maintain for any of the taxable years books of account or records sufficient to establish the amount of his gross income or deductions. Receipts in 1935 For the taxable year 1935, after deducting approximately $70,000 from the gross receipts of Montray for money expended by Montray in the purchase of stock, expenses, etc., the respondent *147 included in petitioner's income a total of $68,911.87 in Montray disbursements. The respondent has conceded that $9,882.68 of this amount was not paid to or for the benefit of the petitioner. The petitioner had admitted that a total of $20,445.19 was paid to or for his benefit. This leaves a total of $38,584 in issue as to whether petitioner received such disbursements or the benefits thereof. The respondent further concedes that $6,267 of the amount received by petitioner was furnished by him to purchase KGR stock and that this sum should be deducted from the amount received by or for him to determine his income for 1935. After concessions by the respondent, it is maintained that petitioner's income from Montray for 1935 should be $52,762.19. The table below indicates the disbursements of Montray which are in dispute for 1935 and the explanation in Montray's cash journal as to each check: Number
Amount
Amount
of Check
of Check
in Dispute
Cash Journal Explanation
113
$2,500.00
$ 2,500
Lee Gordon Exchange a/c H. Crane
8
2,532.87
800
Currency - H. Crane
12
5,070.00
5,000
Harry Crane
27
5,080.00
5,000
Currency - J. Richards
31
3,500.00
500
Currency - J. Richards
38
1,020.00
1,000
Currency - H. C. - J. Richards
46
560.00
500
Currency, H. Crane
49
2,022.50
2,000
Currency, H.C.
52
2,025.00
2,000
Currency
63
3,000.00
3,000
Currency, H.C.
64
3,000.00
3,000
Currency, H.C.
65
4,000.00
4,000
Currency, H.C.
83
542.05
534
Currency, H.C.
86
$1,500.00
$1,500
Currency, N. Y.
91
6,250.00
6,250
Currency, Y.
103
1,012.25
1,000
Currency, H.C.
Disputed receipts
$38,584
*148 The respondent also included in petitioner's income for 1935 deposits of $44,383.19 in petitioner's account in the Lake Shore Trust and Savings Bank, Chicago, Illinois. This account was in the name of Miss C. Pitts, petitioner's bookkeeper. Petitioner failed to prove that the disputed disbursements of Montray and the deposits included in his income were not received by or for his benefit. Receipts for 1936 For the taxable year 1936, after deducting approximately $164,000 from the gross receipts of Montray for money expended by Montray for the purchase of stock, expenses, etc., the respondent included in petitioner's income disbursements of Montray and remittances from H. J. Goulding totaling $293,014.54. Petitioner admitted having received the determined remittances from Goulding in the sum of $13,000. Of the disbursements to petitioner from Montray, respondent determined that a total of $15,000 was paid by Montray for stock. Respondent further concedes that a total of $28,329.54 of the $293,014.54 was not paid to or for the benefit of the petitioner. The petitioner has admitted that a total of $134,100 was received by or for his benefit. This leaves a total of $115,585 in *149 dispute as to whether such disbursements were received by or for the petitioner. The total of $14,879.35 of the amount received by or for petitioner was stipulated to have been a return of advances which petitioner had made previously. After concessions by the respondent, it is maintained that petitioner's income from Montray and remittances from H. J. Goulding for 1936 should be $234,805.65. The following table indicates the disbursements of Montray which are in dispute for 1936 and the explanation in Montray's cash journal as to each check: No. of
Amount
Amount
Cash Journal
Check
of Check
in Dispute
Explanation
141
$ 510.00
$ 510
Currency #2
175
8,000.00
8,000
Currency #3
182
2,000.00
1,000
Currency #1
185
5,100.00
3,100
Currency #1
186
3,010.00
3,000
Currency #1
188
400.00
400
Currency #2
189
1,000.00
1,000
Currency #1
190
1,000.00
1,000
Currency #1
191
2,000.00
1,600
Currency #2
192
2,000.00
2,000
Currency #1 cash
A.M.
199
7,820.00
7,800
Currency #1
200
5,250.00
5,200
Currency #1
239
7,005.12
7,000
Currency #1
252
5,434.58
400
Currency #1, #2
263
13,097.21
13,000
Currency #1
265
1,000.00
1,000
Currency #1
268
500.00
500
Currency #1
269
500.00
500
Currency #1
278
775.00
775
Currency #1
281
15,387.92
4,300
Currency #1
297
5,000.00
5,000
Currency
308
1,500.00
1,500
Currency
314
15,000.00
15,000
Currency #1
315
510.00
500
Currency
331
5,010.00
5,000
Currency
344
1,525.00
1,500
Currency B. To-
ronto
352
24,000.00
24,000
Currency
383
1,005.00
1,000
Currency
Disputed re-
ceipts
$115.585
*150 Of the amount in dispute for 1936, $53,000 represents disbursements of Montray for the purchase of the capital stock of Consolidated Diana Gold Mines, Ltd., hereinafter referred to as Consolidated. The predecessor of Consolidated, Diana Gold Mines, Ltd., was, in 1936, a Canadian gold mining corporation which was in bankruptcy with its assets for sale. Petitioner, through his attorney, A. C. Berman, entered into negotiations with Louis Leipsic of Winnepeg, Canada, with a view toward acquiring the assets of the bankrupt corporation. As a result of the negotiations, it was agreed that $80,000 would be advanced to Leipsic, who would acquire the assets and transfer those assets to a new corporation, Consolidated, in exchange for the 1,000,000 shares of capital stock of Consolidated. Of the $80,000 paid for the assets, Montray provided $53,000 in 1936; Gold Underwriters provided $1,000 in 1937; and the petitioner provided $25,000 in 1936 through a nominee, Herbert R. Ebenstein. The record does not disclose the source of the remaining $1,000. The million shares of stock were issued originally in the name of Ebenstein and were received by him October 7, 1936. Ebenstein was never the *151 owner of such stock. Petitioner was at all times the beneficial owner of all the capital stock of Consolidated. Shortly after Ebenstein received the shares, he turned them over to petitioner and his attorney and since that time stock has been issued in the name of Canadian Mining and Industrial Securities, Limited, a corporation organized expressly for the purpose of holding such stock. This stock has never been sold. Of the million shares of capital stock issued in exchange for the assets of the bankrupt corporation, it was necessary to place the 800,000 shares in the name of Canadian Mining and Industrial Securities, Limited, in escrow until so-called treasury stock could be sold in sufficient numbers to produce $180,000. Shortly after Consolidated was organized, an agreement was entered into between it and Carlisle Investment Trust Limited of London, England, hereinafter referred to as Carlisle, for the sale of Consolidated's treasury stock to Carlisle at $.90 a share. Carlisle was an organization created in England to engage in the business of selling securities. Nevens, at petitioner's request, furnished the funds with which Carlisle began business. Carlisle was wholly owned *152 and controlled by the petitioner. Carlisle purchased and sold in England, pursuant to the agreement, a total of 87,690 shares of treasury stock and remitted to Consolidated a total of $79,163.50 therefor. By October 1937, Carlisle had also acquired and sold 174,125 shares of the 200,000 shares of capital stock which were not placed in escrow. The sales price of the shares in England was five shillings, or approximately $1.25 per share. The last sale of this stock was made in October 1937. The remaining 25,875 shares of non-escrowed capital stock have been held since October 1937 in the name of Maurice Shulman. In September 1937 Consolidated closed down its gold mining operations. The record does not disclose that any of the Consolidated stock was issued to Montray or turned over to Montray for sale. The disbursement by Montray of $53,000 in 1936 was made for the benefit of the petitioner. Petitioner failed to prove that the other disputed disbursements of Montray in 1936 were not received by or for his benefit. Receipts for 1937 For the taxable year 1937, the respondent, after deducting approximately $148,000 from the disbursements of Gold Underwriters on account of stock purchases, *153 advances, etc., included a total of $186,066.05 in petitioner's income. This total is made up of disbursements of Montray, remittances from London and from Joseph H. Martin, Jr., a one time employee of petitioner, and also deposits in the name of Louis D. Pitts. Petitioner admitted having received the remittances from London and from Martin in the total sum of $13,501.45. Respondent now concedes that the figure $186,066.05 should be further reduced to $160,029.72. The petitioner now concedes that a total of $122,965.20 was received by or for his benefit. There is a total of $53,171.68 in issue for 1937 as to whether such sum was received by or for petitioner. This sum includes $9,937.49, which was included in petitioner's income as deposits in the name of Louis D. Pitts. The following table indicates the disbursements of Gold Underwriters and deposits in the name of Louis D. Pitts, which were included in petitioner's income and which are in dispute for 1937: No. of
Amount
Amount
Check
of Check
in Dispute
3
$ 3,353.00
$ 3,353.00
4
9,000.00
3,500.00
5
4,350.00
1,000.00
6
12,650.00
4,800.00
7
3,400.00
3,000.00
8
3,000.00
3,000.00
12
67,286.33
15,000.00
16
1,010.00
1,000.00
20
28,610.75
8,581.19
Deposits in the name
of Louis D. Pitts
9,937.49
Disputed receipts
$53,171.68
*154 The petitioner failed to prove that the disputed disbursements of Gold Underwriters and the deposits in the name of Louis D. Pitts were not sums received by or for his benefit. Business Expenses & Costs Claimed as Deductions The expenses and costs claimed by petitioner as deductions are not properly before the Court. Other Claimed Deductions On August 25, 1927, George L. Kourakos and Tillie L. Kourakos, his wife, executed and delivered their five principal promissory notes, payable to the order of bearer, aggregating $75,000. The first four notes were in the amount of $2,500 each, payable the 25th of August 1928, 1929, 1930 and 1931, respectively. Note #5 was in the amount of $65,000, due August 25, 1932. All of the notes bore interest at the rate of 6 per cent per annum from the date thereof until maturity, payable semi-annually on the 25th day of February and August of each year. These notes were secured by a trust deed in the nature of a mortgage to The Foreman Trust and Savings Bank, as trustee, on real property located at 4146-56 Broadway, Chicago. The makers defaulted in the payment of principal and interest due August 25, 1931 on Note #4. The makers defaulted in *155 the payment of interest due on August 25, 1931 and February 25, 1932 and also the principal due on August 25, 1932 on Note #5. On May 7, 1932, the makers paid $500 on the interest which had been due August 25, 1931 on Note #5. No further payments of principal or interest were made. Petitioner purchased Note #5, hereinafter referred to as the Kourakos note, in the early 1930's after it went into default. On July 26, 1932, the trustee began an action in the Circuit Court of Cook County, Illinois, to foreclose the trust deed securing the five notes, including petitioner's. On April 8, 1933, in the same action, a supplemental bill of complaint to foreclose the trust deed was filed by petitioner's nominee, Harry Cohen, who testified in this proceeding as Harry Crane, and will be referred to hereafter as Crane. On January 5, 1934, the court entered its decree of foreclosure and sale. On February 15, 1934, the property, hereinafter referred to as the Kourakos property, was bought by petitioner's nominee for $40,000 at a public sale conducted by the court's Master in Chancery. Samuel J. Hoffman, petitioner's nominee, was named as grantee in the Master's deed. After the sale, there remained *156 due on petitioner's note the sum of $42,999.39 and on March 9, 1934 the court entered a deficiency judgment in that amount in favor of petitioner's nominee, Crane, against the makers of the note. The court further ordered the receiver previously appointed to remain as such during the statutory period of redemption for the purpose of satisfying the deficiency judgment. In 1934 no income was derived from the property. The period of redemption expired on May 16, 1935 and on May 28, 1935, the court ordered the receiver to deliver possession of the property to petitioner's nominee, Samuel J. Hoffman. On or about March 24, 1936, Hoffman sold the Kourakos property for $10,000 and delivered the proceeds to the petitioner. In petitioner's income tax return for 1935 no deduction was taken for a bad debt on Note #5. In his return for 1936 petitioner did not claim any loss on the sale of the property. The petitioner now claims a bad debt deduction in the year 1935 in the amount of $25,000 as the difference between his claimed cost basis and the bid price at the foreclosure sale. The respondent denies petitioner's right to any bad debt deduction on the note in question. Petitioner also claims *157 an ordinary loss deduction in 1936 of $30,000 on the sale in that year of the Kourakos property. This figure was computed by petitioner by subtracting the $10,000 selling price of the property from the $40,000 bid for it at the foreclosure sale. At about the same time he purchased the Kourakos note, petitioner also purchased Note #3, hereinafter referred to as the Ginsburg note, in the principal sum of $50,000, executed by Leo Ginsburg and Dorothy S. Ginsberg, his wife, secured by a mortgage on real estate located in Chicago, Illinois. At the time of the purchase the note was in default. In 1937 petitioner sold a four-fifths interest in the note to Samuel J. Hoffman for $15,000. Petitioner now claims an ordinary loss deduction of $25,000 in 1937 as a result of such sale. In his income tax return for 1936 petitioner claimed a net loss of $12,304.87 from the sale of securities through a broker. The respondent determined that such loss totaled only $2,304.87; that the securities were capital assets within the meaning of section 117(b), Revenue Act of 1936; and, therefore, such loss was a capital loss, deductible only to the extent of $2,000, under the provisions of section 117(d), *158 Revenue Act of 1936. Some part of the deficiency for each of the years 1935, 1936 and 1937 is due to fraud with intent to evade tax.
Petitioner is liable for the addition to the tax under section 291, Revenue Act of 1936, for his failure to file an income tax return for 1937. Opinion The respondent determined deficiencies in petitioner's income taxes and determined additions thereto for the taxable years 1935, 1936, 1937 and 1939. The respondent has conceded that the year 1939 is barred by the statute of limitations. The deficiencies were determined in part by including in petitioner's gross income for the years before us part of the disbursements by two solely owned Canadian "corporations". Also included in petitioner's gross income were certain bank deposits and remittances from individuals and from London to or for petitioner. The petitioner has admitted that many of the disbursements of the two Canadian organizations and all of the remittances from Goulding and Martin and the remittances from London were made to him or to others for his benefit. We will first concern ourselves with the disbursements of the Canadian organizations. As pointed out in our statement of facts *159 petitioner was the sole owner of two Canadian corporations, Montray and Gold Underwriters, organized to buy mining stock and sell it to his organization in England, called Nevens. We can ignore the fact that Montray and Gold Underwriters were corporations and Nevens was a partnership. Petitioner practically admits, and we have found as a fact, that he was the sole owner of all three organizations; that they operated for him; and he owned all of the income of said organizations. The planned operation was that Montray and Gold Underwriters bought mining stock which they made available to Nevens to be sold in England with the proceeds remitted back to either Montray or Gold Underwriters. The latter organizations made certain disbursements, some of which respondent allowed as cost of stock and expenses and some of which he determined represented income to petitioner. The petitioner admits that he kept no records in the years before us from which his income could have been computed. We therefore have no issue as to the authority of the respondent to reconstruct his income. Our first issue is to determine to what extent the disbursements of Montray and Gold Underwriters were made to or *160 for the benefit of the petitioner. A cash journal was kept by Montray into which receipts and disbursements were entered. No general ledger was kept. Gold Underwriters' only records were its deposit slips, bank statements, canceled checks and check stubs. Disbursements After taking into consideration the concessions of the parties, disbursements of only $38,584, $115,585, and $53,171.68 for 1935, 1936 and 1937, respectively, remain in dispute as to the ultimate recipient of such disbursements. The burden of proof as to the disputed items is on the petitioner and we have found that he has failed to prove the respondent's determination to be in error. We will not discuss each disputed disbursement in detail, however, we will discuss the tenor of the evidence offered concerning the disbursements. To begin with the petitioner admitted quite frankly on cross-examination that he did not know how much money he received from his Canadian organizations in the years before us. For the year 1935, he stated that he "might have received more" than $25,000, or "It might have been" as much as $100,000. He stated that he would be guessing if he made an estimate of what he received and would *161 not hazard a guess for any of the years before us. The petitioner contends that he did not receive any of the proceeds of disbursements of Montray other than those stipulated and admitted on the trial of this proceeding. This was also in essence, the statement of his testimony. We do not think that this general denial is sufficient to overcome the presumption of correctness which attaches to the respondent's determination. See Leonard B. Willits, 36 B.T.A. 294. The petitioner argues that the only money he received from his Canadian organizations was in the form of drafts or wires. He further argues that the only drafts or wires received by or for him were stipulated to or admitted on the trial of this proceeding. He states that the respondent has not proven that he received any drafts or wires other than those stipulated or admitted. As we have stated, it is not the responsibility of the respondent to prove that the disbursements in dispute reached the petitioner. It is the responsibility of the petitioner to prove that they did not reach him. The Canadian organizations were owned by petitioner; he completely controlled and dominated the disbursements of funds and *162 he should be in a position to know for what purposes the disbursements were made if they were not made for or to petitioner. If his burden is made harder because of his own lack of records, or the lack of records of his Canadian operations, the burden is of his own making and he cannot be heard to complain. We are not convinced that many of the disputed disbursements were not used to purchase drafts or wires. Camille Pitts, a witness for the petitioner and his former bookkeeper, testified that when a check had "a large figure with an odd amount" it could be assumed that the odd amount was a bank or telegraph charge. As shown by our findings of fact, many of the checks in controversy came within this description. The petitioner argues that if such drafts or wires had been purchased, the respondent would have found records of such transactions. We agree that the respondent's agents were very thorough in uncovering hidden transactions of the petitioner, but we think that the petitioner is displaying by such an argument a false modesty concerning his ability to cleverly cover up and disguise his transactions. The petitioner admittedly tried his best to hide the fact that he had anything *163 at all to do with the Canadian operations or the money derived therefrom. He admittedly received the proceeds of or the benefit of, many checks or drafts made out to persons such as Harry Crane, Stephen Bernstein, B. Kirsch, J. Richards, J. Richard, and others. Of the several drafts made to Harry Crane, Crane testified that he never received any of the proceeds thereof. He testified that he authorized no one to use or sign his name on any of the drafts. Each of the drafts made to him in 1935 was received by a bookmaker in payment of gambling losses sustained by petitioner. Drafts made to Bernstein and Kirsch were received by them and transferred to petitioner's bank accounts. In 1935 petitioner admitted receiving drafts made to J. Richards and J. Richard. He admitted that he endorsed them respectively as J. Richards or J. Richard. The cash journal for 1935 contains the explanations entered for the issuance of the disputed checks. Most of the checks were payable to currency and endorsed by petitioner's employees. The explanations, however, contain the same cast of names just mentioned, such as Harry Crane, H. Crane, H. C. (meaning Harry Crane), J. Richard, J. Richards, and others. *164 This, we think, indicates that the proceeds of such checks were destined for the same person as those admitted by the petitioner as having been received by him. One of the disputed checks for 1935 had as an explanation in the Journal "Lee Gordon Exchange a/c H. Crane." Lee Gordon testified that petitioner asked that he cash a check for petitioner and he agreed to do so as a favor. Gordon further testified that on or about July 25, 1935 he received a draft from petitioner for $2,500 which had been purchased by Montray, and that he cashed it and handed the petitioner the $2,500 proceeds of the draft. Petitioner denied having received the proceeds of this disbursement but we regard the testimony of Lee Gordon as more reliable. The evidence as to specific 1936 disbursements was much the same as for 1935. Many checks were written on Montray's bank account payable to currency and drafts or telegraphic transfers would be effected in the names of various individuals. Petitioner admittedly received the proceeds or benefit of such transfers which were in the names of or received by J. Richards, J. Richard, Camille Pitts, C. Pitts, Frank Erickson, W. M. Bleet, Abe Shore, Milton Page, George *165 Goldie and others. Milton Page, Frank Erickson and George Goldie are bookmakers and the funds represented by the drafts to Page and Erickson represented gambling losses sustained by petitioner. In Montray's cash journal there were explanations for the above checks such as "Currency", "Currency #1, #2", "Currency #1" and modifications of these explanations. As to the disputed items for 1936, the same general type entries were made in the cash journal as were made for the disbursements which respondent was able to trace to petitioner. Petitioner put on no satisfactory evidence explaining what the code used in the cash journal meant, if anything. Again, it is possible for petitioner to have received the benefit of drafts or cash which were disguised in such a way that respondent's agents could not trace them. Although petitioner testified that he never received any cash from his Canadian operations, we find it impossible to believe that a person, so anxious to hide the fact that he is receiving money from Canada that he uses many names and means to get the funds, would not use the most obvious means of hiding his transactions. Petitioner had a steady stream of hirelings going back and *166 forth between England, Canada and the United States, and, therefore, had plenty of opportunities to receive cash. Of the disbursements in dispute in 1936, checks totaling $53,000 represent disbursements of Montray for the purchase of the assets of a bankrupt corporation which were exchanged for the capital stock of Consolidated. The petitioner argues that this sum should not be included in petitioner's income as the stock was acquired for Montray for resale just as the KGR stock was acquired. The respondent argues that the purchase price furnished by Montray should be included in petitioner's receipts because such amount was paid by Montrary for the benefit of petitioner. We agree with the respondent. The facts regarding the acquisition of Consolidated stock are set out fully in our findings of fact. Briefly, the facts are as follows: petitioner, through his attorney in 1936, entered into negotiations culminating in the purchase of the assets of a bankrupt Canadian corporation for $80,000. The funds for the purchase were furnished as follows: Montray provided $53,000 in 1936, petitioner provided $25,000 in 1936, Gold Underwriters provided $1,000 in 1937, and the record does not *167 disclose the source of the remaining $1,000. The newly acquired assets were transferred to Consolidated in exchange for 1,000,000 shares of its capital stock. The shares were issued in the name of petitioner's nominee, Herbert R. Ebenstein, on or about October 7, 1936. Ebenstein, immediately upon receipt of the shares in New York, turned them over to petitioner and his attorney. A new corporation was then created by petitioner to hold the shares. By October 1937 Carlisle Investment Trust, Ltd., another English selling organization owned by petitioner, had somehow acquired and sold 174,125 of these shares in England for approximately $1.25 per share in United States money. None of the remaining shares have been sold. The whole controversy as to the Consolidated stock acquisition can be settled by determining for whom the stock was acquired. There is no evidence that it was acquired for Montray. In fact, Montray's name does not enter the picture except as the provider of $53,000 of the purchase price. The shares were not issued in the name of Montray; as far as we know, Montray never acquired physical possession of the shares; Montray never sold any of the shares; and as far as we *168 know, neither Montray nor Gold Underwriters received any of the proceeds from the 174,125 shares sold in England. There was some testimony that Carlisle, upon the sale of such shares, turned the receipts over to Nevens and these funds were remitted to Montray along with other funds received by Nevens from the sale of KGR stock. This contention is highly questionable for more than one reason. First of all, the testimony on this contention consisted of the vague assertions by petitioner's brother-in-law, Harry J. Goulding, who admitted that he lied to respondent's agents to hide petitioner's connection with his stock transactions. Second, Montray received its final remittance from Nevens before the 1,000,000 shares were issued by Consolidated in Ebenstein's name, therefore, Montray could not have received money from Nevens for the sale of such stock in England. We think from these facts that there can be little doubt that Montray never had anything to do with the Consolidated stock and that at all times petitioner was the beneficial owner of such stock. Since the stock was acquired for the petitioner, money disbursed by Montray and Gold Underwriters in the acquisition thereof must *169 be included in petitioner's gross income, and we so hold. For the most part, petitioner's evidence concerning disbursements of Gold Underwriters in 1937 was a general denial that he received any funds other than by way of the drafts and wires which were found by respondent's agents. We have already discredited this argument. Other than this general denial, petitioner's evidence was just as unsatisfactory as the general denial and only dealt with four of the disputed disbursements. On brief, petitioner states that while "the evidence is * * * vague as to exactly what was done with all of the funds withdrawn from the two bank accounts [Montray and Gold Underwriters], it is clear that such funds did not get to the petitioner." We agree that the evidence is vague and very unsatisfactory but it is far from clear that the funds did not get to the petitioner. We think petitioner's attorney described the situation quite well in his opening statement when he said: "Through 1935 and 1936 there were a great many checks issued to currency, and that is all. Nobody knows what happened to the money. * * * So far as anybody can find, there isn't any record that the money was paid for expenses *170 or that it was paid for stock. We just don't know what happened to the money." Since the petitioner had the responsibility of maintaining records from which it could be determined "what happened to the money," and since the burden of proof falls on the petitioner to disprove the respondent's determination concerning the disputed disbursements, we hold that the respondent's determination as to the disputed items in the years before us must be sustained on the basis of the entire record. Other Receipts The respondent also included in petitioner's income for 1935 deposits of $44,383.19 in an account in the name of "Miss C. Pitts" located in the Lake Shore Trust and Savings Bank, Chicago, Illinois. Petitioner admitted that the account was his but generally denied that the deposited money represented income to him. He stated that the account was opened in the name of his bookkeeper so that she could pay bills for him while he was out of town. He also testified that he was not engaged in any enterprise for profit in the first six months of 1935 and could have had no income. The burden is on the petitioner to establish that the included deposits were not income to him and again he *171 has failed. Petitioner only attempted to identify two of the deposits totaling $30,000 and he was not sure about those. He thought, to the best of his recollection, that the money was borrowed on pawned jewelry or from the sale of property or mortgages. This evidence is wholly unsatisfactory. As for the petitioner not being engaged in any enterprise for profit in early 1935, we have taken note that petitioner had admitted that many of the disbursements of Montray and Gold Underwriters were received by bookies to pay his gambling losses. The deposits of 1935 in question could have been derived from gambling; however, we need not speculate as to the source as petitioner has failed to disprove the respondent's determination in regard to the deposits. The respondent also included deposits totaling $9,937.49 in petitioner's gross income for 1937 which were in the name of Louis D. Pitts. Petitioner did not testify as to these deposits at all. It is argued on brief that these deposits were the source from which Joseph H. Martin, Jr. made remittances to petitioner's account in 1937 and that petitioner has admitted that the Martin remittances were made for his benefit. The petitioner's argument *172 is that if we charge petitioner with the Pitts' bank deposits, we will be duplicating an income item already charged to petitioner. There is no evidence that Pitts' bank account was the source of the money remitted to petitioner by Martin. Martin testified that on two or three occasions in 1937 he received $1,500 from Pitts, which Martin deposited in his own bank account, and immediately drew a check on his account in the same amount and delivered it to Pitts. He further testified that he assumed that the checks went to Maurice Shulman, petitioner's attorney, because he remembered that one of the checks was made out to Shulman. Besides this, the first deposit in the Pitts' account in Toronto, Canada, was on July 28, 1937 and the first remittance by Martin was deposited to petitioner's account in Hollywood, California, on July 28, 1937. Since the Martin remittances to petitioner's account were by check, it is virtually impossible for Pitts to have used the disputed deposits as a source of the remittance to petitioner's account. We hold on the evidence presented that petitioner failed to prove that the deposits in the name of Louis D. Pitts should not be included in petitioner's gross *173 income for 1937. Business Expenses and Costs Claimed as Deductions The petitioner, on the trial of this proceeding, claimed certain expenses and costs as deductions in connection with his Montray and Gold Underwriters operations. On brief, the petitioner argues that these costs or expenses should be allowed. The respondent argues that such deductions are not before the Court as they were not properly pleaded. None of these deductions was claimed in the returns filed by the petitioner in 1935 or 1936. The original petition made no mention of the failure of respondent to allow any deductions with regard to Montray or Gold Underwriters. An amendment to such petition was filed by petitioner in which the following assignment of error was made: (j) Failure to allow as deductions various costs and expenses in connection with the alleged income considered as received by the Petitioner * * *. The respondent contends that the amendment does not comply with the Court's Rules of Practice (Rule 7(c)(4)(B)4 and 5) which require clear and concise assignments of error as well as clear and concise statements of the facts relied upon as sustaining the assignments of error. From the quoted *174 amendment to the petition, it is impossible to know the year or years for which such deductions were disallowed; it is impossible to know the type or types of "costs and expenses" claimed and it is impossible to know the amounts of such deductions claimed. It is to be observed respondent did allow various costs and expenses with respect to the Canadian organizations which points up the necessity for a definite pleading if error is assigned for failure to allow additional costs and expense items. The purpose of the cited rule, in part at least, is to enable the Court and the respondent to determinine just what matters are being presented for adjudication. Godfrey M. Weinstein, 29 T.C. 142. The quoted "assignment of error" from the amended petition herein is too general. It is insufficient to present the issues as to deductions now claimed on brief. We therefore hold that under the pleadings, no issue has been raised as to deductions claimed on trial and brief relating to the operations of Montray and Gold Underwriters in addition to those allowed by the respondent. See Earl V. Perry, 22 T.C. 968 and George James Nicholson, 3 T.C. 596. The *175 respondent contends that the petitioner has failed to prove any loss in 1936 or 1937 on the 174,125 shares of Consolidated Diana stock sold by Carlisle or on the remaining 825,875 which have not been sold. The petitioner has claimed no such loss in his petition or elsewhere; therefore there is no such loss issue before us. The petitioner's claim was that the money furnished by Montray and Gold Underwriters for the acquisition of the stock should not have been included in his income. We have already settled this argument adversely to petitioner. Petitioner further argues that the $25,000 furnished by him should be allowed to offset the disbursements to him by Montray as a return of funds advanced by Montray. We have already settled this argument by holding that the stock was acquired for petitioner and not for Montray and that there was no showing that any of the proceeds from the sale of Consolidated stock ever reached Montray and Gold Underwriters, and, consequently, never reached the petitioner. The fact petitioner did not prove that any part of the proceeds from the sale of Consolidated stock reached Montray and Gold Underwriters and, therefore, was not included in his income by *176 respondent, would also preclude the reduction of such income by taking any part of the cost price of the stock as cost of goods sold. Other Deductions Claimed Petitioner claims loss and bad debt deductions on the liquidation of the Kourakos and Ginsburg notes which he purchased while they were in default in the early 1930s. The Kourakos note was in the face amount of $65,000 secured by a mortgage on real estate which was foreclosed in 1932, resulting in a decree of foreclosure in 1934, with a deficiency judgment in the sum of $42,999.39. The foreclosure sale was to petitioner's nominee for $40,000 and the period of redemption expired in 1935. In 1936 petitioner sold the property for $10,000. The petitioner claimed no bad debt deduction nor loss regarding these transactions in any income tax returns filed by him. He now claims as a bad debt deduction the difference between his claimed basis of the note, $65,000, and the bid price of the foreclosed property, $40,000. Regulations 86, Article 23(k)-3, pertaining to the Revenue Act of 1934 provide in effect that when mortgaged property is lawfully sold for less than the amount of the debt and the mortgagee ascertains that the amount *177 remaining due after such sale is wholly or partially uncollectible, and charges it off, he may deduct that amount as a bad debt for the taxable year in which it is ascertained to be worthless and is charged off. The respondent contends that the petitioner has not established (1) that he paid par for the note in question, (2) that the deficiency judgment became worthless in 1935 and was not worthless prior to that time, and (3) that even if it did become worthless in 1935, it was not charged off in that year. While we think there is merit to respondent's contention as to whether petitioner paid par for the Kourakos note and as to whether the debt was charged off in 1935, it will be necessary to discuss only the contention that the debt became worthless prior to 1935. The last payment of principal or interest was made on the Kourakos note in 1932. While a deficiency judgment was obtained in early 1934, there is no showing that the deficiency judgment was worth any more than the note after the foreclosure. The petitioner stated that the maker of the note "was pretty well broke" and that no income was being derived from the property in 1934. On brief, petitioner admits that "it was *178 common knowledge that following foreclosures of real estate in the Chicago area that deficiency judgments were uncollectible." If the deficiency judgment was uncollectible following the foreclosure in 1934, and we believe it was, then it follows that the debt represented by such judgment was worthless at that time. It makes little difference that the period in which the maker could redeem his mortgaged property expired in 1935. On the basis of the evidence presented, we hold that the petitioner failed to prove that the Kourakos debt became worthless in 1935, therefore, he is not entitled to the bad debt deduction claimed. As a result of petitioner's purchase and sale of the Kourakos property he also claims an ordinary loss deduction under the provisions of section 23(e)(1), Revenue Act of 1936, in the amount of $30,000. The loss was computed by taking the difference between the bid price of $40,000 and the sale price of $10,000. The respondent seems to admit that the petitioner sustained a loss on the sale of the property in question but maintains that at the time of sale the property was a capital asset, that the loss was capital in nature and deductible only to the limited extent *179 provided in section 117(d), Revenue Act of 1936. We agree with the respondent. The petitioner argues that he was a dealer in securities in the years before us within the meaning of Regulations 94, Article 22(c)-5 and that the sale of the real estate in question represented a liquidation of the stock in trade of securities originally owned by petitioner. Assuming that petitioner established that he was a dealer in securities, he failed to prove that the note secured by the Kourakos real estate was a part of his stock in trade. A dealer in stocks might well deal in personal notes for speculative purposes on his own account. See Thomas E. Wood, 16 T.C. 213. Property cannot be classified as stock in trade unless it is held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. Estate of Jacques Ferber, 22 T.C. 261. We do not think that petitioner proved that the Kourakos note was purchased for other than speculative or investment purposes. He did not state the reasons for his purchase but he testified that he paid par for it. We find it difficult to believe that petitioner purchased at par a defaulted personal note *180 in the depression years of the 1930s for sale to his customers or anyone else. It is fairly obvious to us that the Kourakos note was purchased for investment or speculation, and we so hold. We, therefore, hold, upon the evidence presented, that the property securing the Kourakos note was a capital asset in the hands of petitioner at the time of its sale and is subject to capital loss limitations. The petitioner also claims an ordinary loss deduction in 1937 in the amount of $25,000 as a result of the sale of a four-fifths interest in the Ginsburg note. The facts in regard to this note are similar to those concerning the Kourakos note. They were purchased at about the same time; they were both secured by real property and in default when purchased; and petitioner contends that he paid par for both of them. Petitioner purchased the Ginsburg note, which was in the principal sum of $50,000 in the early 1930s, and sold a four-fifths interest in it in 1937 for $15,000. The respondent contends that (1) petitioner failed to prove his basis in the note and (2) if he did, such note was a capital asset in the hands of petitioner and any loss from the sale thereof would be subject to capital *181 loss limitations. Petitioner contends on brief that he purchased for $40,000 only a four-fifths interest in the $50,000 note and that he sold all of his interest to Samuel J. Hoffman for $15,000. He computed his loss by subtracting the $15,000 sales price from $40,000, his claimed purchase price. The evidence, however, indicates that he purchased all of the Ginsburg note and sold four-fifths of it to Hoffman for $15,000. This is indicated, among other things, by the letter written to petitioner by Hoffman stating that upon sale of the note the sales price would first go to reimburse Hoffman in the amount of $15,000 and the balance would be divided equally between the petitioner and Hoffman. This certainly indicates that petitioner retained an interest in the note. We think it inherently improbable that petitioner paid par for the Ginsburg note. We hold that one-half of par would be more consistent with the evidence, times and circumstances, and therefore hold that petitioner's basis in the Ginsburg note was $25,000. Cohan v. Commissioner, 39 Fed. (2d) 540. For the same reasons that we hold the Kourakos property a capital asset in the hands of petitioner, we hold *182 that the Ginsburg note was also a capital asset and the loss sustained is subject to capital loss limitations. In his income tax return for 1936, petitioner also claimed a net loss of $12,304.87 from the sale of securities through a broker. Petitioner now contends that this loss should have been $2,304.87. The respondent determined that such loss was a capital loss and should be deductible only to the extent of $2,000 under the provisions of section 117(d), Revenue Act of 1936. The petitioner put on no evidence concerning the nature of the securities sold, therefore, we uphold the respondent's determination. Additions to Tax Respondent determined additions to tax in 1935, 1936 and 1937 under section 293(b) of the Revenue Acts of 1934 and 1936. Such sections provide for a 50 per cent addition if "any part of any deficiency is due to fraud with intent to evade tax." The burden is on the respondent to prove fraud by clear and convincing evidence. Arlette Coat Co., 14 T.C. 751. We are convinced that the respondent has carried his burden. Petitioner attempted in every way possible to disguise his transactions in Canada and conceal the receipt of money therefrom. He *183 admitted that he received such money in the names of others for the purpose of concealment. The reason given by petitioner for having received money in the names of others was that he had been kidnapped by the underworld and did not want it known that he had money. This is at best a lame excuse. The excuse is quite inconsistent with his admission that his gambling losses to bookmakers such as Frank Erickson were in excess of $50,000 during the years before us. We are convinced from the entire record that the purpose for concealing receipt of such income was to wilfully evade the tax. We therefore hold that some part of the deficiency in each of the years before us is due to fraud with intent to evade tax. The respondent also determined an addition to the tax under section 291, Revenue Act of 1936, for petitioner's failure to file a return for 1937. The burden of proof under the 1936 Act is on the petitioner to show that his failure to file a return was due to reasonable cause and not to wilful neglect. Commissioner v. Lane-Wells Co., 321 U.S. 219. Petitioner's only excuse was that "I didn't make any profits in that year" and that not filing "was a mistake" on his part. *184 This is not a reasonable cause for failing to file a return in 1937 and the respondent is sustained in his determination. The petitioner contends that the statute of limitations bars the claimed deficiencies in income taxes in the years before us. Our findings that petitioner filed false or fraudulent income tax returns in 1935 and 1936 and filed no return in 1937 make it unnecessary to further discuss such contention. See section 276(a), Revenue Acts of 1934 and 1936. Decision will be entered under Rule 50.